Fecteau, J.
On August 29, 1997, this matter came before the Court for hearing on plaintiff James Jarosz’s (“Jarosz”) motion to disqualify and strike the appearance of Warner & Stackpole, LLP, (“Warner & Stackpole”) and its attorneys on behalf of the defendants Union Products, Inc. (“UPI”) and Union Products Realty Corp. (“UPRC”). As grounds for his motion, Jarosz argues that Steven Palmer (“Palmer”), an attorney at Warner Stackpole, had represented him, as well as the fledgling corporations, during the earlier transactions which underlie this action. Defendants oppose the motion, asserting that no attorney/client relationship existed between Palmer and Jarosz individually.
For the following reasons, the motion is DENIED.
BACKGROUND
During January 1996, Jarosz became aware of an acquisition opportunity at Union Products, a Leominster company engaged in the manufacturing and sale of plastic consumer products, including the ubiquitous pink flamingo lawn ornaments. During the following months Jarosz and Edward Boudreau (“Boudreau”), Dennis Plante (“Plante”), and Donald Featherstone (“Featherstone”) (collectively, “the partners”), current executives at UPI, agreed to attempt to acquire the business, and to become partners in UPRC for that purpose. Jarosz was in contact with Palmer regarding legal advice for the acquisition, draft partnership agreements, and employment contracts.[2] This contact included a May 8, 1996, memorandum addressed to the “Management Group,” and a November 21, 1996, letter addressed to Boudreau, Featherstone, Jarosz, and Plante, with a proposed Partnership and Employment Agreement.[3] Further, minutes from a November 5, 1996, meeting reveal that “our [the companies’] attorneys at Warner & Stackpole” should be notified of a change in the directors.*
The acquisition was eventually completed, and Jarosz became a 25% stockholder, officer, director and employee of the corporations. During the financing of the acquisition, Jarosz and his partners executed personal guarantees of the corporations’ indebtedness. In January 1997, however, relations soured between the four partners, and Jarosz was terminated.
At some point between January 1996 and January 1997, Palmer advised Jarosz and the other partners that they should consider obtaining separate lawyers to protect their individual interests. Jarosz alleges that this warning did not come until January 1997. Palmer contends he informed Jarosz of possible conflicts as early as a May 1996 meeting with the partners, wherein Jarosz allegedly informed the partners that Palmer was acting as the company’s lawyer and should be paid by the new company, UPRC.
Jarosz also alleges that he consulted with Palmer on two personal matters after the acquisition closed: a second mortgage on his personal residence and back pay from Intelligen, Jarosz’s former employer. Palmer’s affidavit asserts that a search of Warner & Stackpole’s records revealed no record of a consultation regarding the second mortgage on Jarosz’s personal residence. And, as Jarosz concedes, Palmer did *57 not represent him on the back pay issue, but referred him to counsel at another firm.
In late January 1997, Jarosz commenced this suit against the corporations. In July 1997, Jarosz filed a malpractice action against Palmer and Warner & Stackpole in Middlesex Superior Court.[4]
DISCUSSION
Jarosz seeks to disqualify Warner & Stackpole as counsel for the defendants, based on Attorney Palmer’s purported previous representation of him. At the outset, the defendants filed a Motion to Strike Jarosz’s Supplemental Affidavit filed in support of his motion to disqualify. Defendants claim that the affidavit contains “new" facts not previously disclosed and constitutes unfair surprise. The defendants’ motion is DENIED, for the reason that defendants will suffer no prejudice from the Court’s consideration of Jarosz’s supplemental affidavit, since Jarosz’s motion will itself be denied.
In order for Jarosz’s motion to succeed, he must meet the threshold burden of establishing that an attorney-client relationship existed between himself and Palmer during the acquisition dealings. See, Bays v. Theran, 418 Mass. 685, 690 (1994). If such a relationship existed, Palmer’s current role as opposing counsel might be improper. See, Wellman v. Willis, 400 Mass. 494, 498 n.8 (1987) (the “substantial relationship" test regarding disqualification in successive representation cases, although not expressly adopted in Massachusetts, looks only at whether the matters embraced in the pending suit are substantially related to the matters wherein the attorney previously represented the client; client confidences are presumed to have been disclosed).
Here, Jarosz has not provided any evidence that an express contract for legal representation existed between himself, individually, and Palmer.[5] Accordingly, if an attorney-client relationship existed at all, it must be found through implication. “An attorney-client relationship need not rest on an express contract. An attorney-client relationship may be implied when (1) a person seeks advice or assistance from an attorney; (2) the advice or assistance sought pertains to matters within the attorney’s professional competence; and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.” Bays, 418 Mass. at 690, citing DeVaux v. American Home Assurance Co., 387 Mass. 814, 817-18 (1983); Williams v. Ely, 423 Mass. 467, 475 (1996). “All three requirements must be met to establish the relationship.” Fanaras Enterprises, Inc. v. Doane, 423 Mass. 121, 125 (1996).
Here, Jarosz relies on his “belief that Palmer was his personal attorney, and his “reliance” on Palmer to protect his personal interests during the acquisition as grounds for an attorney-client relationship. Jarosz also relies on the fact that he was the only member of the group to communicate with Palmer, that he referred to Palmer as “my attorney,” that Featherstone referred to Warner & Stackpole as “those expensive Boston attorneys of yours,” and that Palmer allegedly failed to advise him to retain his own attorney until more than twelve months after their initial contact.
None of these facts, however, indicate that Jarosz sought advice from Palmer on personal, noncorporate matters or that such advice was ever given. Moreover, even if Jarosz did “rely” on Palmer to protect his interest, “that reliance may or may not have been reasonable, but it did not establish an attorney-client relationship.” Id. See also, Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 523, cert. denied, 493 U.S. 894 (1989) (where putative client made no request for personal representation and no specific contract of representation existed, no attorney-client relationship). Further, Jarosz has not produced evidence that he, individually, paid Palmer for his time or that he, individually, provided Palmer with any retainer. See, Symmons v. O’Keeffe, 419 Mass. 288, 300 (1995) (where no fee agreement discussed, no retainer paid and no bill sent, no relationship found).
From the record, Jarosz has only demonstrated that he, in his capacity as an officer ofUPRC, consulted with Palmer regarding documents and legal advice for UPRC’s acquisition of UPI. An attorney-client relationship clearly existed between Palmer and UPRC, of which Jarosz was a member. However, “an attorney for a corporation does not simply by virtue of that capacity become the attorney for its officers, directors or shareholders.” Robertson, 404 Mass. at 522. The fact that Jarosz was an officer and shareholder of a close corporation does not change the analysis. See, Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C., 405 Mass. 506, 513 (1989) (“counsel for a closely held corporation does not by virtue of that relationship alone have an attorney-client relationship with the individual shareholders"). Without a stronger showing of direct interaction between Jarosz and Palmer on personal, nonbusiness matters, no attorney-client relationship existed, either explicitly or implicitly, between Jarosz and Palmer.
Jarosz also relies upon contact he had with Palmer on other matters before and after UPRC’s acquisition of UPI. However, even assuming that an attorney-client relationship existed between Palmer and Jarosz on those occasions,[6] “(t]he fact that an attorney agreed to, or did, represent a client in a particular matter does not necessarily create an attorney-client relationship as to other matters or affairs of that client.” Robertson, 404 Mass. at 522. Unable to produce sufficient evidence that Palmer was his personal attorney during the acquisition dealings, Jarosz has faded to meet his burden of establishing an attorney-client relationship.
This Court is also mindful of the concern that ”[t]he high costs of attorney disqualification on litigants and on the court system militate against the indiscriminate *58 allowance of disqualification motions,” Gorowitz v. Planning Bd. of Nantucket, 394 Mass. 246, 250 (1985), that “(c]ourt resources are sorely taxed by the increasing use of disqualification motions as harassment and dilatory tactics,” Id. at 250 n.7, and that Courts should be “cautious [about] judicial disqualification of counsel.” Byrnes v. Jamitkowski, 29 Mass.App.Ct. 107, 109 (1990), citing Serody v. Serody, 19 Mass.App.Ct. 411, 413 (1985).
In this case, Jarosz has not produced sufficient record evidence that Palmer represented him individually during the acquisition and corporate formation, but only that Palmer represented the corporation. Without such a showing, this Court is not convinced that Palmer’s continued representation of defendants would “taint the legal system or the trial of the cause before it,” necessitating disqualification. Byrnes, 29 Mass.App.Ct. at 109, citing Borman v. Borman, 378 Mass. 775, 790 (1979). Absent a more substantial showing of conflict, disqualification of Warner & Stackpole would unfairly deprive defendants of their “right to representation by counsel of their choice,” and is inappropriate. Levitt v. Levitt, 9 Mass.App.Ct. 894, 894 (1980).
ORDER
For the foregoing reasons, it is hereby ORDERED that Plaintiff James Jarosz’s Motion to Disqualify Warner & Stackpole is DENIED.

Jarosz had met Palmer in December 1990, while Jarosz was involved with Ryka, Inc. Palmer was then an attorney at Ryka’s corporate counsel firm, O’Connor, Broude, Snyder and Aronson. When Palmer joined Warner & Stackpole, Ryka retained Warner & Stackpole as corporate counsel. Jarosz was also in contact with Palmer during 1995 and early 1996, while Jarosz was employed at Intelligen Energy Systems; in the end, Intelligen did not retain Palmer.

The partners names are listed in alphabetical order, without titles.

Editor’s Note: Reported in the opinion immediately following at 8 Mass. L. Rftr. No. xxx, xxx (March 23, 1998).

Jarosz v. Palmer and Warner & Stackpole, LLP, Civil No. 97-3589 (Middlesex Super. Ct. July 1, 1997).

It is evident from the record that Palmer did represent UPRC during its acquisition of UPI.

Jarosz’s prior contacts with Palmer apparently involved Jarosz’s employers; on the scant facts before the Court, it appears that Palmer was working for Jarosz’s employers, not Jarosz. Subsequent contacts between Palmer and Jarosz, mentioned supra at 3, resulted only in a referral to another law firm.